1

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO.  21-mj-02699-AOR
3


4    UNITED STATES OF AMERICA,

5                   Plaintiff,

6         vs.

7                                      Miami, Florida
                                       April 15, 2021
8    NIVIANE PETIT PHELPS,             Pages 1-29

9                   Defendant.
     _____

10

11              TRANSCRIPT OF PRETRIAL DETENTION HEARING
             BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
12                 UNITED STATES MAGISTRATE JUDGE

13

     APPEARANCES:
14

     FOR THE PLAINTIFF:
15                        United States Attorney's Office
                          BY:  ABBIE D. WAXMAN, A.U.S.A.
16                        99 Northeast Fourth Street
                          Miami,  Florida 33132
17

18   FOR THE DEFENDANT:
                          BY:  SCOTT B. SAUL, ESQ.
19                        1351 Northwest 16th Street
                          Miami, Florida 33125
20

21

     TRANSCRIBED BY:      DAWN M. SAVINO, R.P.R., C.R.R.
22                        Official Federal Court Stenographer
                          400 N. Miami Avenue, 10S03
23                        Miami, Florida  33128
                          Telephone:  305-523-5598
24

25
```

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2         THE COURT:  I see you, Ms. Phelps.  We see you.  We
 3   just --
 4         IT TECHNICIAN:  It's going to take a few seconds for
 5   the Zoom to unmute, Judge.
 6         THE COURT:  How about now, Ms. Phelps?  Can you hear me
 7   now?  You can.
 8         I'm going to call the case.  Case number 21-2699,
 9   Magistrate Judge Otazo-Reyes, United States versus Niviane Petit
10   Phelps.  I have appearances as Ms. Waxman, Mr. Saul.
11         And Mr. Saul, are you prepared to go forward?
12         MR. SAUL:  I am, Your Honor.
13         THE COURT:  All right.  Ms. Waxman?
14         MS. WAXMAN:  Yes, Your Honor.  As relates to the
15   pretrial detention hearing, the Government plans to proceed
16   under 3142(f)(2)(a), a serious risk that the Defendant will
17   flee.
18         Additionally, Judge, we do believe that under the
19   3142(e), that no condition or combination of conditions will
20   reasonably assure the appearance of the person as required, and
21   the safety of any other person and the community.
22         May I proceed by factual proffer?
23         THE COURT:  Yes.
24         MS. WAXMAN:  On or about February 13th through the 18th
25   of 2021, the Defendant sent her husband, who is incarcerated,
```

1    videos of herself threatening the life of the Vice President

2    Kamala Harris.  Notably, her husband is presently facing murder

3    charges.  The Defendant sent the videos using a special

4    application that allows an individual to send 30 second videos

5    to an inmate.

6            Once they were made aware of the threats, the US Secret

7    Service got involved and obtained and reviewed the videos that

8    the Defendant had sent to her husband.  It appears that these

9    videos were filmed at both the Defendant's home and at her place

10   of work.  For reference, she is a nurse at Jackson Memorial

11   Hospital.

12           While some of the videos were benign, others were not.

13   Specifically in some videos, the Defendant, sometimes holding a

14   large serrated kitchen knife, screamed obscenities at the

15   camera, ranting about her hatred of the President, Vice

16   President and ex-President Obama and others.  In some of these

17   videos, she threatened to kill Vice President Kamala Harris.  In

18   some of the videos, the Defendant was being filmed by her

19   children while in others she was in her scrubs in what appeared

20   to be a patient or hospital room.

21           Specifically she said -- and Judge, I'm going to go

22   through a few of these videos by date.  There is profane

23   language in them.  I apologize for the use of the language.

24           THE COURT:  Well are these the ones that are described

25   in the criminal complaint of which I'm aware?

1       MS. WAXMAN:  There are additional ones, Your Honor.

2       THE COURT:  Okay.

3       MS. WAXMAN:  February 13, 2021, the Defendant sent a

video and stated "Kamala Harris, you are going to die.  Your

days are numbered already.  Someone paid me $53,000 just to fuck

you up and I'm going to take the -- I'm going to do the job.

Okay?  I know you sent a foreclosure in my, to my door.  I'm not

stupid bitch, okay?  But Joe Biden, I know you care about your

vice president.  If you care so much, all this could be over

with.  All you gotta fucking do is sign, Joe Biden.  This is

some real bullshit I'm dealing with Kamala Harris", and then the

video cuts off.

13      On February 14th of 2021, she sent a video and said

"you ain't black, bitch, and I'm not going to stop until you get

out the chair.  You cannot fucking be vice president or even

fucking president.  I put a stop on your ass, bitch.  Fuck you,

ho."  And that video cuts off.

18      On February 14, 2021, another video was sent where the

Defendant states "that's why you gonna fucking die and I wish

your fucking husband would, Kamala Harris.  You gonna fucking

die, bitch, okay?  If I see you in the street, I'm gonna kill

your ass, Kamala Harris.  Fuck you, bitch.  Fuck you, Kamala

Harris.  You stank pussy.  I hate you, bitch.  I hate you.  I

hate you Kamala Harris.  Fuck you, bitch.  Go eat some dirt."

25      And then on February 18th, the Defendant sent another

1   video where she states "they're not going to fix our home, our

2   roof.  We got roof damage.  Our roof is about to cave in.  We

3   got a fucking president, Joe Biden, who doesn't like black

4   people and fucking Kamala Harris, I swear to God, today is your

5   day you gonna die.  50 days from today, mark this day down, you

6   stupid bitch.  Kamala fucking Harris, vice president, you gonna

7   fucking die 50 days from today, I swear to fucking God."  And

8   then the video cuts off.

9         On February 18th, again, the Defendant sent another

10  video stating "50 days from today you will die, I swear to God,

11  I put that on everything.  On my grandparents' grave.  I put

12  that on everything.  Vice President Kamala Harris, you will

13  fucking die 50 days from today.  You gonna start seeing the

14  signs, okay bitch?  $53,000, I'm the hit man.  They hired me to

15  kill you, okay?  From today, 50 days from today, you will

16  fucking die, okay?  My situation is popped, my vein popped,

17  everything fucking popped, okay?  And yes, I am."  And then the

18  video cuts off.

19        In one video filmed after the Defendant said she was

20  going to a gun range for Kamala Harris, the Defendant filmed

21  herself at a gun range learning how to and discharging a

22  firearm.

23        Also of note, law enforcement learned that the

24  Defendant subsequently applied for a concealed weapons permit on

25  February 22, 2021 which was after the filming of the video

1    threatening to kill Kamala Harris.

2          On March 3, 2021, law enforcement attempted to speak

3    with the Defendant.  When they asked the Defendant if there were

4    any guns in her house she said "no, but I plan on getting one."

5    She then refused to speak with them further on that date.

6          But on March 6, 2021 after she was put on

7    administrative leave at work, she reached out to the United

8    States Secret Service and agreed to speak.  When asked about the

9    videos, the Defendant said she didn't care if the warden saw her

10   messages.  She followed up by saying she thought to herself "you

11   know what?  Here goes nothing, I don't care."  When confronted

12   with the videos, the Defendant tried to minimize them stating

13   "they weren't that bad and the vice president is pretending to

14   be black."  When asked what would have happened if the United

15   States Secret Service did not come to her house and speak with

16   her, the Defendant said "I don't know.  I don't know."  When

17   asked about her visit to the gun range, she said she kept the

18   target sheet because she liked to look at it.

19          At the conclusion of the interview, United States

20   Secret Service asked if she planned on traveling to Washington

21   and the Defendant said that she did not, but her daughter, who

22   was present in the room, responded to the Defendant by saying

23   "didn't we say we were going?"

24          That's the conclusion of the Government's proffer.

25          THE COURT:  Mr. Saul, do you wish to inquire?

```
1          MR. SAUL:  Yes, I would like to cross-examine the agent
2     please.
3          THE COURT:  Can I have him sworn?
4          COURTROOM DEPUTY:  Agent, please raise your right hand.
5     Do you solemnly swear or affirm that the testimony you're about
6     to give will be the truth, the whole truth and nothing but the
7     truth, so help you God?  Thank you.
8          Please state your name, spell your first and your last
9     name for the record, and tell us where you're employed.
10         THE WITNESS:  My name is Lucas White.  L-U-C-A-S,
11    W-H-I-T-E.  I'm employed by the United States Secret Service as
12    a special agent, and have been so for the last three and a half
13    years.
14         THE COURT:  Before you begin Mr. Saul, I see that
15    several counsel have started joining thinking that they are
16    joining the afternoon session which we are still in the morning
17    session.  So counsel who are joining us thinking that they are
18    making initial appearances, let me estimate that you have a half
19    hour that you should feel free to sign off and back on for.  Go
20    ahead.
21         MR. SAUL:  Thank you.
22                         CROSS-EXAMINATION
23    BY MR. SAUL:
24    Q.  Agent, good morning or good afternoon to you.
25    A.  Good afternoon, sir.
```

1    Q.   Are you the lead case agent on this case?

2    A.   Yes, sir.

3    Q.   And so you authored the complaint.  I'm assuming you've done

4    a lot of investigation on the case, correct?

5    A.   I have, sir.

6    Q.   All right.  So let's talk about Ms. Phelps.  She's a

7    39-year-old nurse, correct?

8    A.   A licensed practical nurse, yes sir.

9    Q.   And no priors, never been arrested, correct?

10   A.   To the best of my knowledge, that's correct.

11   Q.   You're going to vet her in every which way possible,

12   correct?

13   A.   Every way that I have available, yes.

14   Q.   Okay.  And so this emotion or animosity towards a

15   politician, unfortunately this is very much in vogue in the last

16   couple years where a lot of people vent on social media.  Would

17   you agree with me?

18        MS. WAXMAN:  Objection, Judge.  Relevance, outside the

19   scope of this hearing.

20        THE COURT:  Sustained.  And it's not outside the scope,

21   but for purposes of the relevance.

22        MR. SAUL:  Okay.

23   BY MR. SAUL:

24   Q.   So Agent, this JPay is essentially how a loved one would

25   communicate with their loved one that is incarcerated, correct?

1    A.   Yes.

2    Q.   And there's no confidentiality obviously, but the aim is

3    just for the recipient that's an inmate to get it, correct?

4    A.   That's the designed purpose of the application, yes.

5    Q.   And the application is limited to 30 seconds, correct?

6    A.   The VideoGram part of the application is limited to 30

7    seconds.

8    Q.   So the recipient of these JPay videos is an inmate named

9    Joseph Phelps, correct?

10   A.   Correct.

11   Q.   And he was convicted on a murder case, correct?

12   A.   Correct.

13   Q.   And he's been -- I don't know the details, but at least

14   eight years he's been incarcerated on this case, correct?

15   A.   I would say that's correct, yes.

16   Q.   And since you're the case agent, you're vetting my client.

17   Despite him being incarcerated for eight years, these two are

18   still married, correct?

19   A.   They are still married, yes.

20        MS. WAXMAN:  Objection, relevance, Judge.

21        THE COURT:  Overruled.

22   BY MR. SAUL:

23   Q.   And they have three children together, correct?

24   A.   Yes, correct.

25   Q.   And as you're vetting my client, her communications go way

1   beyond the subject matter here meaning she has a normal

2   husband-wife relationship and is communicative with him all the

3   time, correct?

4   A.   I don't want to get into what's normal for a husband and

5   wife, but they do communicate regularly.

6   Q.   And you know that the Defendant Phelps has been making

7   efforts to try to get her husband out of custody, correct?

8   A.   Yes, that's correct.

9   Q.   Now, other than venting to her husband, has Ms. Phelps

10  explained her political views in any other platform?

11  A.   Not to my knowledge.   Not that I've discovered.

12  Q.   So this is totally -- you're listening to -- granted, these

13  are quite startling conversations, but these conversations are

14  really limited between a husband and wife.   That's it, right?

15  A.   The terms of service of JPay state that videos will be

16  monitored, and the person sending the videos does have to agree

17  to those terms of service in order to use the app.   Application.

18  Q.   Have you observed more videos than just the videos that have

19  the subject matter of this criminal case?

20  A.   Yes, I have.

21  Q.   Would it be fair to say that the husband, the convicted

22  murderer, Joseph Phelps, is inflaming or inciting Mrs. Phelps.

23  A.   No, that would not be fair to say.

24  Q.   Would it be fair to say that he repeatedly says to his wife

25  "please do something to get me out of here."

1    A.  Yes.

2    Q.  Okay.  So as far as gun ownership, that would be completely

3    legal because there are no legal impediment to prevent Ms.

4    Phelps from having the gun, correct?

5    A.  At the time that she was photographed or at the time that

6    she was at the range, that is correct.  However, she has since

7    been issued a risk protection order through the state of Florida

8    which precludes her from legally purchasing or possessing a

9    firearm for the duration of one year from its date of issue.

10   Q.  And that's when this case blew up, right?

11   A.  That's when the case started.

12   Q.  And are you a firearm enthusiast?

13   A.  I am to the extent that I use them for my profession.

14   Q.  How often do you go to the gun range?

15         MS. WAXMAN:  Objection, Judge.  Relevance.

16         THE COURT:  Do you want to proffer a relevance,

17   Mr. Saul?

18         MR. SAUL:  Well, I'll withdraw that question.

19   BY MR. SAUL:

20   Q.  Agent, it is completely legal and normal for a gun owner to

21   take their gun to a gun range, is it not?

22   A.  Yes.

23   Q.  And when the prosecutor was discussing that Ms. Phelps kept

24   a target at her house, was that just a basic target you would

25   see anywhere?

1    A.  Yes, it was a basic target.

2    Q.  It's not like -- it doesn't have the Vice President's face

3    on it or anything creepy like that, right?

4    A.  No, it does not.

5    Q.  And would it not be normal for people to keep successful

6    targets, just like a trophy, to show their -- you know, how

7    adept they are at shooting?

8    A.  In certain contexts it would be normal, yes.

9    Q.  Okay.  So you created a complaint because you felt that

10   there was probable cause to arrest Ms. Phelps, correct?

11   A.  Correct.

12   Q.  And you're familiar with this charge, correct?

13   A.  Yes, I am.

14   Q.  And so a vital aspect, an element of the charge, it has to

15   be a serious threat, it can't be idle talk or a careless remark,

16   correct?

17   A.  Yes.  Correct.

18   Q.  And so other than Ms. Phelps expressing her feelings to her

19   husband, she hasn't expressed to anybody else.  There's no

20   conspiratorial situation going on, right?

21   A.  She has expressed it to the people who filmed the videos for

22   her, as well as the people who have to screen the videos to be

23   delivered.

24   Q.  Okay.

25   A.  And she committed an overt act in furtherance of her threat

1   by going to the gun range for weapons familiarization and

2   selection and training.

3   Q.  Well, that's your interpretation, but let me conclude this

4   cross-examination that really any gun owner is supposed to go to

5   a gun range.  That's kind of the protocol to learn how to

6   properly and safely operate a gun, and at a gun range there's

7   always going to be instructors and people to help you, correct?

8   A.  Yes, correct.

9            MR. SAUL:  Okay.  I have no further questions, Your

10  Honor.

11           THE COURT:  Okay.  Ms. Waxman?

12           MS. WAXMAN:  Can I briefly ask a couple of questions,

13  Your Honor?

14           THE COURT:  Please.

15                     REDIRECT EXAMINATION

16    BY MS. WAXMAN:

17  Q.  Agent White, when you interviewed the Defendant, you

18  specifically asked her if she thought anybody would see these

19  other than her husband.

20  A.  That's correct, I did.

21  Q.  And what did she say to you?

22  A.  She said she believed the general would see these videos,

23  and we were later able to determine that she meant the warden of

24  the institution where he's incarcerated.

25  Q.  Agent White, additionally when she was filming these videos

1  in her home, is it apparent that somebody else was filming them

2  for her?

3  A.  Yes, it is apparent.

4  Q.  In the videos where she's filming them at her place of work

5  or what appears to be her place of work, is it apparent that

6  somebody else is filming the videos for her?

7  A.  Yes.

8       MR. SAUL:  Objection.  These questions are calling for

9  speculative answers.

10      THE COURT:  These questions or this question?

11      MR. SAUL:  This question is calling for a speculative

12  answer.  I didn't object to the preceding question, but there's

13  a pattern of asking for speculative answers that I'm objecting

14  to.

15      THE COURT:  Overruled.  It's based right on the

16  criminal complaint.  You can answer the question.

17      THE WITNESS:  I'm sorry.  Could you repeat the

18  question?

19    BY MS. WAXMAN:

20  Q.  That the videos filmed at her place of work or what appears

21  to be her place of work, is it apparent that somebody else is

22  filming the videos?

23  A.  Yes.

24  Q.  Specifically in the videos where somebody else is filming at

25  her place of work, don't you hear that person say "go" to signal

1   her to begin the video?

2   A.  Yes.

3   Q.  Prior to going to the gun range, did the Defendant tell you

4   that she had no familiarity with guns?

5        MR. SAUL:  Objection.  Leading the witness.

6        THE COURT:  It's not really leading, but where are you

7   going, Ms. Waxman?  Can you proffer the relevance?

8        MS. WAXMAN:  Judge, the proffer of the relevance is

9   that the Defendant admitted to law enforcement that she never

10  used guns, never wanted guns, never had guns prior to actually

11  going to the gun range after making these threats "Kamala

12  Harris, I'm going to the gun range for you."

13       THE COURT:  I think that's clear from the affidavit.

14       Do you have anything else?

15       MS. WAXMAN:  No further questions, Your Honor.

16       THE COURT:  Okay.  Okay.  I'll hear your arguments.

17       MS. WAXMAN:  Judge, as it relates to the Defendant

18  being a serious flight risk, while I anticipate that the defense

19  will argue she's been a nurse at Jackson Memorial Hospital for

20  20 years and has no prior convictions, she is facing 33 to 41

21  months as the guideline range for this specific charge if

22  convicted.  While that does not account for acceptance, that's a

23  serious term of imprisonment that an individual, who has never

24  been to prison or has never faced any jail time, could flee

25  from.

1          Additionally, she has a passport at home and has family

2     ties in Haiti, specifically so much so that her parents, who are

3     in Miami, just returned from Haiti where they also have

4     significant family ties.

5          The danger to the community that she poses, Your Honor,

6     is significant.  This is a crime where the Defendant, knowing

7     others would be listening, transmitted threats to kill this

8     country's vice president.  And not only did she say those

9     things, she actually took action in furtherance of those

10    threats.  She was holding a serrated knife in some of the

11    videos, she went to a firing range, she applied for a concealed

12    weapons permit, she even told law enforcement that she was going

13    to get a gun.  While these all can be legal and seem legal and

14    seem like they may be nothing to somebody who doesn't disperse

15    so many threats to take somebody's life, looking at the totality

16    of the circumstances these do suggest that she is a danger to

17    the community.

18          She stated to law enforcement specifically that if they

19    had not come to her house to speak with her, she doesn't know

20    what she would have done.  On several of the videos she put a

21    countdown on the death of the vice president of this country and

22    specifically, the countdown asserted "50 days from today is the

23    day that you will die", and she was arrested prior to that 50th

24    day coming to light.

25          Given these circumstances, Your Honor, it's the

1    Government's position that she is a danger to the community and

2    she poses a serious flight risk facing these charges.

3              THE COURT:  Okay.  Mr. Saul?

4              MR. SAUL:  Yes, Judge.  In regards to risk of flight,

5    my 39-year-old client has never been out of the country.  She

6    doesn't even have a current passport.  She is a single mother

7    that has three children ages 17, 15 and 11.  She is a homeowner

8    at 2740 Northwest 174th Street where she's had that same house

9    for 17 years.  She has had the same job at Jackson Memorial

10   Hospital for 20 years.  Her ties to the community and her

11   stability could not be any stronger.

12             Just because she's of Haitian heritage does not mean

13   she is going to flee to Haiti.  And I will tell you that just

14   living in this community, I've been here since 1980 and I'm very

15   familiar with a lot of people from Haiti, you don't see too many

16   people wanting to go to Haiti, they come here.  But the concept

17   of fleeing to Haiti, I think, is illogical.  I think there is

18   absolutely no signs that she's a risk of flight, it's the

19   opposite.  She has a lot of stability and she knew for a couple

20   days she was the subject of a criminal investigation and took no

21   obstructionist behaviors, so I don't think there's a risk of

22   flight.

23             As far as being a danger to the community, number one,

24   there is no statutory presumption, the guidelines are relatively

25   low.  If the maximum punishment is five years, then that would

1    be comparable to a third degree felony and in third degree

2    felonies, the state world, you don't see detention for something

3    that's considered a lower-level felony.  So this case should be

4    very interesting to everybody because a knee-jerk reaction when

5    you hear this type of language would be oh my God, this is

6    startling, this is terrible.  This is very concerning.  Except

7    for we're all lawyers, so we look beyond the language.  And in

8    this particular charge, even though you don't have to carry out

9    the threat, that threat needs to be real.  That threat needs to

10   be more than just idle talk, you have to be able to consider

11   that talk as a serious threat and it's not idle talk.  And I

12   suggest to this Court that that is all this talk is, it's idle

13   talk.  It's a woman that is venting to the closest person in her

14   life.  These are intimate conversations.  Yes, they know the

15   conversations are going to be listened to, that the warden is

16   going to be listened to (sic), but that is just the result of

17   somebody being institutionalized and just saying I don't care

18   anymore, I know the last eight years our conversations have been

19   listened to.        But all this is is my client venting.  And

20   why is she venting?  My client has been married for a long time.

21   She is obsessed with her husband, and that husband has been

22   saying to her "get me out, get me out", and she's unhappy

23   because the prior presidential administration in her mind she

24   thought was going to be instrumental in securing some type of

25   prison mitigation.  And now with the new administration, that's

1    not happening.  And that's the reason that my client is upset.

2         So having a gun, what the Government is arguing is

3    interpretative.  It's not the subject of any type of proof.

4    Whether my client has a gun or going to a gun range, this is

5    legal behavior.  Now, mind you she is a single woman that takes

6    care of three kids, that works in the Civic Center area and

7    lives in Miami Gardens.  It is not unusual for people in that

8    position to want to get a firearm just for protection.  And I

9    would submit to this Court that going to a gun range is a sign

10   of being responsible with your gun and learning the proper

11   techniques and the proper things to do with the gun, and having

12   access to somebody that can be an instructor.

13        So the merits of this prosecution, that will be

14   addressed by a jury later on.  But as far as being housed with

15   detention over just words, you know, this country has changed a

16   lot in the last 20 years, and I think my client has been

17   infected with the sick politics that has affected this country

18   and made so many people do crazy and stupid things.  But most of

19   the crazy and stupid things is freedom of speech.  They're not

20   acting upon it.  This is not a January 6th situation where my

21   client is in Washington D.C., she's going to The Capitol and you

22   know, something is imminent.  This is just my client talking

23   with her husband, the person that's the closest person in her

24   life, and just airing out her grievances.  And it's going to

25   come out wrong.  I don't mean to unfairly criticize anybody.

1   It's kind of like a Big Brother situation.  Our country is

2   moving into a direction where everything is filmed and

3   everything is recorded.  So now our personal things that were

4   never anybody's business are now, they percolate up to the top

5   and everybody gets to see them.  So if my client didn't

6   effectuate anything, if she has no priors at age 39, if all she

7   was doing was talking to her husband, nothing else, then the

8   concept of keeping her in jail with no bond, it's too harsh

9   because it's -- she's got bad thoughts, but there's no bad

10  actions and bad thoughts are not illegal.

11          And how realistic was it that this 39-year-old was

12  going to do something?  She didn't act when she was -- when she

13  interacted with law enforcement, she didn't obstruct anything,

14  she was not disrespectful, she was not hostile, she acted in an

15  appropriate manner.  So she thought bad things.  Why did she

16  think bad things?  Well, because she's emotionally involved.

17  People that are married, they get mad.  "I'm going to kill you",

18  that happens all the time.  You don't go to jail for it.

19      So my client is presumed innocent, there is nothing to have

20  any other presumption about her other than she's a good person.

21  Everything about her life demonstrates goodness, not badness.

22  You go 39 years, you live in the same house for 17 years, you

23  have the same job for 20 years, I think if you get arrested you

24  should be entitled to the benefit of -- the benefit of not

25  presuming my client is something that there's no evidence that

```
1    she is.  Please release her on something.
2              THE COURT:  Mr. Saul, I want, please, to recognize the
3    gentleman who's been here, I think, since 10:00 this morning for
4    this hearing?
5              MR. SAUL:  Okay.
6              THE COURT:  Do you want to put his name on the record?
7              MR. SAUL:  I don't know.  I know that my client's
8    sister and brother have been observing this the whole time.
9              THE COURT:  Okay.  I want the record to reflect that
10   family has been here, and patiently, for almost four hours in
11   support of Ms. Phelps.
12             Mr. Saul, I don't disagree with most of what you said,
13   including Ms. Phelps, importantly that you stand here before me
14   presumed innocent, that the bond statute presumes that there are
15   conditions that I have to release you on unless I find that no
16   condition or no combination of conditions are sufficient to
17   reasonably assure the safety of the community.  And that, again,
18   a lot of the argument you've made, Mr. Saul, is really intended
19   for a different judge.  Whether ultimately you'll be arguing
20   that for acquittal or at sentencing, much of the explanation
21   about the motivations or seriousness, and as we've just
22   established, she stands in front of me pre-conviction and
23   presumed innocent.  And so there are good arguments, they're
24   just not what I can meaningfully apply under 3142.
25             At the end of the day, what I have -- and I also agree
```

1  with you that I don't see Ms. Phelps as a serious risk of flight

2  here.  Notwithstanding the fact that I did once have a Defendant

3  flee to Haiti on a drug case, so it does happen, I don't think

4  that the evidence here demonstrates that she is a serious risk

5  of flight because she has ties to Haiti or that for her this

6  would be a significant sentence.  There is always, in federal

7  court, a sentence that could incentivize someone to flee, but I

8  just don't find that that's the issue with Ms. Phelps.

9         The problem is that it is not just words.  We have very

10  specific threats targeted at one specific person, videotaped.

11  Notwithstanding your argument that the evidence was intended to

12  be private, the Agent has testified otherwise that it was on a

13  platform that was public.  That she articulated to the Agent

14  that she knew that it would be viewed.  That others filmed it.

15  So these were threats that she either intended or recognized

16  were going to be transmitted and communicated and made known,

17  and they are extremely specific.  I think it is very meaningful

18  that she twice refers to a $50,000 payment that she has decided

19  to accept and characterizes herself as a hit man.  So much too

20  of the argument that she was just venting, that recorded

21  statement suggests that she is willing to be but a vehicle for

22  someone else's intention to assassinate the vice president.

23         And then, of course, there are the statements or rather

24  the evidence beyond her statements that demonstrate that she was

25  preparing to act on it, including the daughter's statement that

1   they were -- or that suggests that the mother articulated that

2   she was planning to go to D.C. and among others which, Mr. Saul,

3   this is, I think, a very difficult case because the

4   characteristics of your Defendant would otherwise absolutely

5   weigh in favor of her getting a bond.  She has stable

6   employment.  She has a home.  She has children.  She's been in

7   the same relationship for 17 years.  Her personal

8   characteristics absolutely under 3142(g) would weigh in favor of

9   release.  The nature and characteristics of this offense and the

10  nature of the evidence, meaning that it is video recorded or

11  otherwise was articulated to the witness, who here is testifying

12  from his first person knowledge of those statements, is very

13  substantial.  This is evidence of a serious risk to a victim

14  under the statute, and it is substantiated by very significant

15  evidence.

16          As I sit here -- so let me be clear that that is my

17  finding, that they've met that burden and then nonetheless, I

18  have to consider are there conditions that would reasonably

19  assure the safety of that victim.  And here, I consider the fact

20  that the Agent has already told me that there is some order in

21  place that would prevent her from lawfully obtaining a firearm

22  in the next year, which would tend to mitigate against the

23  danger but it doesn't alleviate it.  And I understand, you know,

24  you're recommending the conditions that she be permitted to be

25  released to work, the evidence is that she committed part of the

```
 1    offense while she was at work.  I don't see how there are --

 2    considering the gravity of the risk that she presents based on

 3    the very significant evidence that's been presented, what

 4    conditions I could meaningfully impose to mitigate and

 5    reasonably assure that victim's safety.

 6         MR. SAUL:  Well Judge, can I -- if I can address that.

 7    So first of all, her two siblings have been very involved and

 8    they would certainly supervise her.  They would say that the

 9    basis for all the problems is that my client's highly

10    manipulative husband makes her crazy, and she's obsessed with

11    him and they can get involved and prevent it.  I would say

12    whether it's a defendant or whether it's somebody pretty smart

13    and doesn't even have a criminal case, I would say that having

14    access to the vice president is a pretty difficult thing.  And

15    so it shouldn't be that hard to set up something to guarantee

16    the vice president's safety, meaning if my client is restricted

17    to her house and can't leave the county, then how could she be

18    in any way a threat to somebody that lives in Washington D.C.?

19         THE COURT:  So notwithstanding both the crime and the

20    proffer focus on that particular victim, ultimately the standard

21    is to reasonably assure the safety of the community.  And the

22    characteristics here described, I mean truly, even in the

23    argument that was offered on her behalf, mitigate against my

24    ability to find that she doesn't present a danger to the

25    community.  And those are the factors that I have to try to
```

1    evaluate in fashioning a condition of bond.

2           MR. SAUL:  I mean, Judge, how could all those people --

3    not all those people, but people from the insurrection for

4    January 6th, some of those people get released and I think they

5    form a much more realistic threat than my client ever did.

6           THE COURT:  It's very hard to -- it's a very -- that's

7    a very compelling point.  It's just very hard for me to compare

8    in the ephemeral what another judge had in front of him or her

9    to evaluate bond.

10          I will give you, Ms. Waxman, the last chance to respond

11   to that.

12          MS. WAXMAN:  Judge, it sounds like defense's argument

13   is that we caught her before she did it, and that's a little bit

14   of a scary argument to present to the Court.

15          If it assists in Your Honor's ruling, she won't be

16   allowed back at work.  Work is aware of what's going on and that

17   suggests that when she was put on administrative leave, because

18   they were made aware of these threats, that that is an

19   additional reasonable person who -- and I'm going to read

20   directly from the pattern jury instructions, that a true threat

21   is a serious threat, not idle talk, a careless remark or

22   something said jokingly that is made under circumstances that

23   would lead a reasonable person to believe that the defendant

24   intended to kill, kidnap, inflict bodily harm upon the vice

25   president.

1           Judge, to suggest that the fact that somebody notified
2      the US Secret Service of these videos which began this
3      investigation, meaning that's our first reasonable person who
4      saw these videos and said hey, Secret Service, you guys need to
5      be made aware of this.  Then we have Agent Lucas or -- excuse
6      me, Agent white who is on the call, another reasonable person
7      who viewed those videos and believed that he needed to go to her
8      house to investigate this because these were credible, real,
9      true threats under the law.
10          THE COURT:  I understand.  But Ms. Waxman, I think that
11     you're arguing the merits of your crime here and PC has already
12     been established.
13          MS. WAXMAN:  Judge, I'm only suggesting that she
14     doesn't have a job to go back to at this point.  So
15     understanding that, she's now just going to be sitting at home
16     under defense's suggestion twiddling her thumbs thinking about
17     this.
18          Additionally, the argument that those involved in the
19     January 6th attack on the Capitol, some of them had been
20     released; Judge, every case, as Your Honor is aware, consists of
21     different circumstances, history, priors.  All different
22     information.  I believe it's unfair to suggest to the Court that
23     because they were released she should be released.  Each case
24     should be taken under its own set of facts.  And as Your Honor
25     has already said, with these specific one, two, three, four,

1    five videos, and there are more videos Your Honor, these are

2    just the five that are the most concerning that Your Honor is

3    caused pause, that Your Honor is concerned about the safety of

4    the community, that Your Honor is concerned about what Ms.

5    Phelps did in furtherance of these threats and the fact that she

6    took steps in furtherance, again is not something that the

7    Government needs to prove, but it suggests the validity of them.

8             THE COURT:  Yeah.  Ultimately, Mr. Saul, I appreciate

9    your extremely articulate argument with respect to holding her

10   on words alone, but we have substantial steps that she took in

11   furtherance of the threat.  I hear you when you say how

12   realistic was it that she was ever going to get to the vice

13   president, and ultimately I don't have to make that decision.

14   That is not either the standard for your underlying case or here

15   at the bond, but rather whether or not the nature of the offense

16   demonstrates by clear and convincing evidence that she presents

17   a danger to this community and then from there, are there

18   conditions I think I can impose that reasonably assure the

19   community.  And I don't think that home detention and

20   prohibiting her from having a firearm or even restricting her

21   ability to speak to the husband that you say is the motivating

22   factor are, under the circumstances of this offense, going to be

23   sufficient to reasonably assure the community's safety.  I'm

24   going to reduce it to a written order Mr. Saul, and it's not an

25   indicted case so it will go to the duty judge who may

1    understandably see it differently.  So, you know, it wouldn't be

2    the first time it was appealed and, you know, most judges will

3    give you a de novo hearing on it if you want to see how one of

4    the District Court Judges sees the evidence.  I'll enter that

5    written order today so that you can make your decision for Ms.

6    Phelps.

7           The preliminary arraignment -- I'm sorry.  The

8    preliminary or arraignment is scheduled in this case for

9    February 23rd.  That will be your next appearance in court, Ms.

10   Phelps.

11          MS. WAXMAN:  April, Your Honor?

12          THE COURT:  Did I not say April?  April 23rd.

13          MS. WAXMAN:  You said February.

14          THE COURT:  I don't even know what day of the week it

15   is Ms. Waxman.  So I'm reading 4-23, that is April 23rd, in

16   front of the duty magistrate judge.  That's, yeah, eight days

17   from now.

18          Mr. Saul, you prepared well and hard for that

19   appearance and I'm grateful for the very difficult decision that

20   you made me make here, but I appreciate you giving me a full

21   picture of Ms. Phelps who is excused.  That concludes duty court

22   for this morning.

23          MR. SAUL:  Okay.  Thank you, everybody.

24          (PROCEEDINGS CONCLUDED)

25                         *  *  *  *  *

PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

1              **C E R T I F I C A T E**
   I certify that the foregoing is a correct transcript from the
2  digital audio recording of proceedings in the above-entitled
   matter.
3

4  <u>4/21/2021</u>            <u>/s/ Dawn M. Savino, R.P.R., C.R.R.</u>
   Date                   DAWN M. SAVINO, R.P.R., C.R.R.
5

6

7                        **I N D E X**

8                         **WITNESSES**

9  ALL WITNESSES:                                    PAGE:

10  For Government:

11    Lucas White:
      Cross-Examination by Mr. Saul             7:22
12      Redirect Examination by Ms. Waxman        13:15

13                        **EXHIBITS**

14  None

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING**
**TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY**
**AND COMPUTER—AIDED TRANSCRIPTION**